UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:  Lizette Calogero,

                        Debtor.

Case No. 14-30070
Chapter 7

---

AmeriCU Credit Union,

                        Plaintiff,

      v.

Lizette Calogero,

                        Defendant.

Adv. Proc. No. 14-50004

---

Appearances:

Curtis A. Johnson, Esq.                      for Plaintiff
Davidson Fink, LLP
28 East Main Street
Rochester, NY 14614

Laura M. Harris Courage, Esq.             for Defendant
Harris-Courage & Grady, PLLC
225 Greenfield Parkway, Ste. 107
Liverpool, NY 13088

**Memorandum-Decision and Order**

      AmeriCU Credit Union ("AmeriCU" or "Plaintiff") filed this adversary proceeding against Lizette Calogero ("Defendant" or "Debtor") seeking a determination that a car loan deficiency balance of $22,445.79 ("Debt") is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).[1] AmeriCU specifically claims that Debtor, with intent to deceive Plaintiff in order to obtain a car loan, materially misstated her financial condition

---

[1] Unless otherwise stated, all sectional references are to Title 11 of the United States Code.

in a credit application, upon which AmeriCU reasonably relied in extending credit. The court conducted a two-day trial on January 9 and 16, 2015. Based upon the entire record of these proceedings, the court finds that Debtor lacked the requisite intent to deceive—an essential element of Plaintiff's claim—and finds the Debt dischargeable.

*Jurisdiction*

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(I). This memorandum-decision and order incorporates the court's findings of fact and conclusions of law as permitted by Fed. R. Bankr. P. 7052.

*Background Facts*

Debtor is currently employed as a bank teller at NBT Bank where she has been working since June 10, 2013. Her prior thirty-year work history has been primarily in the financial services sector, working for either a bank or federal credit union in entry level positions as a cashier or customer service representative. In the latter capacity, Debtor has helped customers obtain nominal loans and is familiar with the type of information lending institutions consider when deciding to extend credit. Plaintiff is a regulated federal credit union with a loan portfolio of over a billion dollars.

In September 2012, Debtor purchased a 2012 Toyota Rav4 ("Rav4"). She financed $35,298.40 of the purchase price by first completing a handwritten credit application at the dealership (Defendant's Exhibit A). The application accurately reflected her employment as a Member Service Specialist at Horizons Federal Credit Union for two years, her then monthly income of $3,022, and her three-year residency in Endicott, New York. Based upon that information, Debtor was approved for a five-year

loan with payments of $588.30 a month. While that loan was in effect, Debtor remained current and timely on her payments.

In February 2013, Debtor left her job with Horizons Federal Credit Union and moved in with her boyfriend in West Monroe, New York. She started a new job in June 2013 as a bank teller at NBT Bank, working a 30-35 hour week at $13.80 an hour.

After work on Tuesday, July 23, 2013, Debtor went to Burdick Toyota ("Burdick"), an automobile dealership in Syracuse, New York to inquire about trading in her Rav4 for a new car that would be more fuel efficient. The Debtor met with Matthew Montoya, a Burdick salesperson, who recommended a 2012 Toyota Prius Plug-In Hybrid ("Prius"). The Debtor decided that she would purchase the Prius and trade in her Rav4, but only if she obtained new financing. According to Debtor's testimony, she filled out a handwritten credit application that evening, which accurately represented that she worked as a bank teller at NBT Bank for the past month and a half, earned approximately $1,794 to $2,093 a month,[2] and had lived in West Monroe, New York for the prior three and a half months. The original handwritten credit application that Debtor claims to have filled out is now missing from her file at Burdick. Although some testimony questioned whether there was an original credit application completed by the Debtor, the court, as discussed *infra*, concludes that there was. The application gave Burdick permission to pull Debtor's credit report, which it did that evening. Debtor was told she would be contacted if approved for a loan and she went home that night.

The next day, Burdick's Finance Manager, James Brillante, inputted Debtor's information into a company computer that utilizes special computer software. The

---

[2] This range represents Debtor's monthly income calculated on a 30 to 35 hour work week, compensable at $13.80 an hour.

3

software releases the information to different lending institutions which then analyze the information provided and use it to determine whether or not to approve a loan request.[3] AmeriCU approved the request to extend financing totaling $42,218.42 (Joint Stipulation of Facts ¶ 14). This amount included the Prius sales price of $36,323.92, the $5,607 balance owed on the Rav4 after the trade-in credit was applied, taxes and fees (*Id.* at ¶¶ 8-15). Debtor received a call from the dealership that she had been approved for a loan. The loan required monthly payments of $588.29 for 84 months, a penny less than Debtor's prior monthly payment on her Rav4. Debtor made arrangements to pick up her new car and fill out the required paperwork on Saturday, July 27, 2013.

When Debtor picked up the car, she signed approximately 10 to 15 documents. One of the documents Debtor signed was AmeriCU's Loanliner Express Credit Application. (Plaintiff's Exhibit 6) ("loan application"). The typed information on the loan application is the product of the computer software program, which reflects the information that was typed in by Burdick's Finance Manager, James Brillante. The only handwriting on the form is Debtor's mother's maiden name and the Debtor's signature dated July 27, 2013. However, the typed information in the loan application does not accurately represent Debtor's financial, employment, or living situation. According to the loan application, Debtor had been working at NBT Bank for the past year and a half (not month and a half), was making $4,400 a month (not $1,794 to $2,093), and had been living at her current residence for the past two years (not three and a half months). Debtor also signed AmeriCU's Loanliner Application for an AmeriCU Account Card (Plaintiff's

---

[3] Some lenders may take additional steps to confirm an applicant's information. Testimony at trial indicated, however, that unless something in the application triggers the need for further inquiry, AmeriCU accepts the information provided as the basis to accept or reject an applicant.

4

Exhibit 7) ("account card application"). However, the account card application identifies Debtor as a Relationship Manager at NBT Bank (not a teller).

Debtor subsequently defaulted on her loan with AmeriCU and surrendered the Prius just prior to her filing for chapter 7 bankruptcy relief on January 22, 2014. Plaintiff sold the car and is currently owed a deficiency balance, which Debtor listed on Schedule F of her petition and seeks to discharge. At the 341 meeting of creditors, Curtis Johnson, attorney for Plaintiff, brought to light the discrepancy in income as between what the Debtor actually makes and what is reflected in the signed AmeriCU loan application. According to Debtor, this was the first time she became aware that the information in the signed loan application was not accurate.

That same day, after the 341 hearing, Debtor drove to Burdick demanding to see her file in hopes of obtaining a copy of her original handwritten credit application. Debtor initially met with and explained her situation to Mr. Montoya, the original sales representative, who referred Debtor to Burdick's Business Manager, Keith Naples. Mr. Naples, however, was unable to access Debtor's file at that time and indicated that he would get back to her. After not hearing further from Mr. Naples, Debtor returned to Burdick a second time the following week. She then spoke with both Mr. Naples and Burdick's General Sales Manager, Mike Calcagnino. According to Debtor's testimony, she was shown a file, but it did not contain her original handwritten credit application. Contrary to her testimony, both Mr. Naples and Mr. Calcagnino testified that they could not have shown Debtor her file because due to Burdick's privacy policy, neither had access to her file.[4] Subsequent to her second visit, Debtor wrote several emails to Mr.

---

[4] According to the testimony offered by Burdick's employees, after the information on the handwritten credit application was inputted into a Burdick computer, the document would become part of the

Calcagnino inquiring about her written application and made numerous telephone calls in an attempt to locate the missing application. She went right to the top of the organization, speaking with Kevin Burdick, the franchise owner. When her efforts proved futile, Debtor lodged a complaint against Burdick with the office of the New York State Attorney General. Debtor testified that she also sought counsel to handle, on a *pro bono* basis, a direct action against Burdick.

*Arguments*

*1. Plaintiff's Argument*

Plaintiff seeks a determination that the deficiency balance of $22,445.79 plus interest owed by Debtor is nondischargeable under § 523(a)(2)(B). Plaintiff alleges that the Debtor intentionally made materially false misrepresentations as reflected in both the signed AmeriCU loan application and account card application. According to Plaintiff, this misinformation—specifically that she made $4,400 a month and was a Relationship Manager at NBT Bank for the past year and a half—was intentionally provided by Debtor as reflected in both the AmeriCU loan application and account card application which Debtor signed. While the original handwritten credit application is missing, Plaintiff claims that the printed documents which bear Debtor's signature are sufficient to infer fraud since the information could easily have been corrected by Debtor before signing if she did not intend to deceive Plaintiff. Additionally, Plaintiff contends that Debtor was an experienced banker who knew she would not qualify for a loan without making these misrepresentations concerning her job and monthly income.

---

customer's file. It would then be sent to Burdick's billing office and kept under lock and key. Due to the company's privacy policy, access to the billing office and its files was restricted to very few individuals, including the comptroller and the franchise owner, Kevin Burdick.

6

Plaintiff also argues that its decision to fund the loan without verifying Debtor's information was reasonable. According to Plaintiff, AmeriCU separately pulled Debtor's credit report after Debtor's information was received from Burdick. Based upon the collective information it had, AmeriCU decided to fund the loan. According to Plaintiff, this constitutes reasonable practice pursuant to both its own procedures as well as within the car finance industry. Plaintiff argues it had no further responsibility to verify Debtor's income nor any other information in the instant case when Debtor's income, job title, and duration of employment all appeared accurate at face value. Had Debtor been listed as a teller with a monthly income of $4,400, then Plaintiff claims it would have asked to verify Debtor's income. However, based upon the information AmeriCU had, such was deemed unnecessary.

### 2. *Debtor's Argument*

Debtor argues that the information she provided in her original handwritten application was completely accurate—reflecting her true monthly income range of $1,794 to $2,093 and that she was a teller at NBT Bank since June 2013. Debtor supports this argument with her testimony that she went back to Burdick at least twice in an effort to obtain her original credit application. She testified that on her second visit she was provided with her file, but that the original handwritten application was not included. She also testified to the fact that she wrote several emails to Mr. Calcagnino inquiring about her missing written application and made numerous phone calls, including to Mr. Burdick with whom she spoke. Debtor also lodged a complaint with the Attorney General against Burdick and contacted other attorneys in hopes of finding one to take her case against Burdick *pro bono*.

Debtor blames Burdick, claiming that it changed the information she provided to the dealership and misplaced or destroyed her original credit application. Debtor argues that the Burdick employees who handled the sale were incentivized by potential commissions to change her information and to cover their tracks to keep their jobs. In the alternative, Debtor argues that Mr. Brillante either got distracted when inputting the information into the computer, or inputted the wrong information based upon the lapse in time between Tuesday night, when Debtor filled out the application, and Wednesday morning, when the information was logged into the computer.

Debtor also argues that she did not read all the documents before signing them when she picked up the car. At that point, signing the documents was a ministerial act. The documents were voluminous and the printing on each—including the signed loan application and account card application—appeared very small. While the Debtor was generally told what each document was, she was not specifically told to read them in their entirety or to check for their accuracy before signing.

Finally, Debtor contends that Plaintiff could not have reasonably relied solely on the information it was provided and that Plaintiff had a duty to verify Debtor's information. In support of this argument, Debtor points to the inconsistencies in the credit report pulled by Burdick (Plaintiff's Exhibit 4) and the credit report pulled by AmeriCU (Plaintiff's Exhibit 3) and specifically highlights the fact that Debtor was reported to have been at NBT Bank since only July 2013 as reflected in the credit report pulled by Burdick. Debtor also argues that to extend a loan without verifying income is a highly irresponsible and negligent practice.

*Burden of Proof*

According to the United States Supreme Court, the burden of proof on a § 523(a) claim lies with the party claiming non-dischargeability, which must be proved by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 287–88 (1991). Additionally, the Second Circuit has "repeatedly stressed that the 523(a) exceptions to discharge must be strictly construed in favor of the debtor in order to comport with the 'fresh start' policy underlying the Bankruptcy Code." *Zohlman v. Zoldan*, 226 B.R. 767, 771 (S.D.N.Y. 1998) (internal citations omitted).

*Discussion*

1. *523(a)(2)(B)*

Section 523(a)(2)(B) provides in relevant part that a discharge under § 727 does not discharge a debtor from any debt for an extension of credit obtained by a writing: "(i) that is materially false; (ii) respecting the debtor's…financial condition; (iii) on which the creditor to whom the debtor is liable…reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2)(B). It is clear from the signed AmeriCU loan application that there exists a writing that is materially false regarding the Debtor's financial condition. What is left for the court to decide is whether (i) Plaintiff reasonably relied on the writing, and (ii) Debtor caused it to be made or published with intent to deceive.

2. **Reasonable Reliance**

The Second Circuit has held that the reasonableness requirement of § 523(a)(2)(B)(iii) is to be determined under the totality of the circumstances and is a relatively "low hurdle for the creditor to meet." *In re Bonnanzio*, 91 F.3d 296, 305 (2d

9

Cir. 1996) (citing *In re Shaheen,* 111 B.R. 48, 53 (S.D.N.Y.1990)). The reasonableness requirement is "directed at creditors acting in bad faith." *In re Bonnanzio,* 91 F.3d at 305. The nature of lending does not require that a creditor perform an extensive investigation of a debtor's representations or creditworthiness beyond what ordinary business practices would dictate. *See In re Jemal,* 516 B.R. 238, 246 (Bankr. E.D.N.Y. 2014); *see also In re Wong,* 291 B.R. 266, 275–76 (Bankr. S.D.N.Y. 2003).

Based on the above standard, the court finds Plaintiff's reliance in this case reasonable. The fact that Debtor was required to provide the dealership with certain information in order to obtain a loan, permits the inference that the lender was going to rely on the information, which Debtor should have understood. The court recognizes the general business practice of lenders in the car finance industry to make decisions based upon information provided by the borrower. The court heard extensive testimony concerning AmeriCU's lending process from both Gabriel Snyder, who approved this particular loan, and Kathryn Cashel, who oversees the entire lending department at AmeriCU. According to the testimony, Plaintiff relied upon the credit report it pulled as being the most recent information and, therefore, did not consult the credit report pulled by Burdick or compare the two. Additionally, the testimony supported the fact that the section in the credit report pertaining to employment information is often not accurate and not necessarily updated when an individual takes a new job. Plaintiff accepted the information it received from Burdick as accurate because, at face value, it appeared so. According to Ms. Snyder, Debtor's monthly income of $4,400 did not seem out of the ordinary. Debtor's listed position as a Relationship Manager was a more senior level

position with the requisite earning potential. Therefore, it was determined that Debtor had a good income to debt ratio, which qualified her for the loan.[5]

Ultimately, based both upon the information supplied by the dealership, and the information in the credit report pulled by Plaintiff, the court believes that Plaintiff exercised reasonable reliance in making the loan in good faith. The court rejects the claim that Plaintiff should have taken further steps to verify the information before deciding to extend credit to the Debtor.

### 3. *Intent to Deceive as a Necessary Element*

Since intent to deceive under § 523(a)(2)(B) can rarely be proven with direct evidence, the law permits the requisite intent to be inferred from the totality of the circumstances. *In re Launzel-Pennes*, 191 B.R. 6, 17 (Bankr. E.D.N.Y. 1996) (citing *In re Bodenstein*, 168 B.R. 23, 29 (Bankr.E.D.N.Y.1994)). The element of intent may also be inferred "[w]here ... a person knowingly or recklessly makes a false representation which the person knows or should know, will induce another to make a loan." *In re Furio*, 77 F.3d 662, 625 (2d Cir. 1996) (citation and internal quotation marks omitted).

The court had the opportunity to hear and weigh the testimony of the Debtor as to her visits to Burdick and the circumstances of the loan advanced by AmeriCU. The court found Debtor to be a very credible witness, exhibiting a forthright demeanor, without cunning or guile.

---

[5] Among the loan information AmeriCU considered was the fact that Debtor's monthly liabilities approximated $1,500. (Plaintiff's Exhibit 2, p. 3-4). Ms. Synder testified that in determining Debtor's income to debt ratio, it was standard practice to incorporate an additional $200 debt amount to account for property taxes and living expenses, even when Debtor was living with someone else and was not paying rent or a mortgage.

The court accepts at face value Debtor's testimony that she was totally unaware of the misstatements in the signed loan application until they were brought to her attention at the 341 hearing. This is evidenced by Debtor's good faith efforts to retrieve her original handwritten application in what was a clear attempt to completely exonerate herself. It is antithetical to any logical course of action that Debtor would have vigorously pursued recovery of her original handwritten application if it contained the misinformation alleged by Plaintiff—the discovery of which would have marked her as a fraud and threatened her future employment in the only industry she has worked in for the past thirty years.

Kelly Carwell, Burdick's Comptroller, testified that an original credit application never existed because it was not in Debtor's file when she reviewed it. The court found Ms. Carwell's demeanor extremely defensive and her testimony was clearly her attempt to exonerate Burdick. Ms. Carwell's position as Comptroller did not afford her first-hand knowledge of the facts underlying Debtor's application process. Contrary to her testimony, the court finds that there had to be an original credit application. The four other Burdick employees testified that it was Burdick's standard procedure to have customers fill out handwritten credit applications when applying for a loan through the dealership. Debtor went to Burdick on a Tuesday evening and dealt with Mr. Montoya who testified that he had Wednesdays off. Debtor's information was not logged into a computer until Wednesday, when the Debtor was not present, by a third-party, Mr. Brillante. Without an original credit application, there is no other source from which Mr. Brillante could have obtained information relating to the Debtor.

The court finds that when Debtor learned that AmeriCU would extend her credit, Debtor had no reason to question her approval for a loan. The monthly loan payment was exactly one penny less than Debtor's prior car payment, which she had been able to afford. Contrary to Plaintiff's assertion, Debtor's banking experience did not provide her with the necessary objectivity to realistically assess her own ability to qualify for a new car loan. Nor did the newness of Debtor's position as a teller at NBT Bank provide her with a sufficient track record to adequately gauge what impact her reduced salary would have on her finances. At worst, Debtor misjudged her ability to afford the loan payments.

After being approved for the loan, the necessary paperwork requiring Debtor's signature on multiple documents became a ministerial act that did not involve due attention to the writings nor any deceitful intent on her part. The printing in the documents was small and condensed. The court accepts Debtor's testimony that she provided true and accurate information at the outset and, therefore, when she came in to pick up the car four days later, she had no reason to scrutinize the earlier-applied-for loan documents before signing them. Given the record before the court, the court does not find Debtor's behavior—specifically, her signing both the loan and account card applications that contained false financial information—to be reckless so as to warrant a finding of the necessary intent to support Plaintiff's claim.

*Conclusion*

Plaintiff has failed to establish a necessary element of its claim, namely that Debtor acted with intent to deceive. Accordingly, a separate judgment shall issue dismissing Plaintiff's complaint. Costs may be taxed on motion.

So Ordered.

Dated: February 23, 2015  
       Syracuse, New York

Margaret Cangilos-Ruiz  
United States Bankruptcy Judge